Good morning, Your Honors. My name is Karen Bucher, and I represent the appellant Samuel Brown. And with the Court's permission, I'd like to reserve two minutes for rebuttal. This is the case where the victim... Can I ask you about his limp? Yes, please. Can I explore the limp with you? And if, and I'm not saying I am, but say I was persuaded that there might be a problem here. Could I send it back for an evidentiary hearing? Or are we kind of stuck because it wasn't fully developed in state court and we're stuck with the record? Let's talk about what's in the record that says he doesn't have a limp at this point. Yes. What is in the record that he could have presented was testimony. First of all, this is a medical condition. He could have presented evidence from family members and from friends that he did not walk with a limp. His personal injury lawyer reviewed... Well, not that he could have. What's in the record? In other words, what family, what declarations are in the record or things like that? The declaration from his personal injury attorney, Danny Brace, submitted a declaration stating he reviewed all of his medical records because he represented him in a prior personal injury action. The shooting took place in 1997, right? Correct. And the injury was at 1995 that Brace represented him in? It's in this declaration. It was very recent. It was before the shooting, right? Yes. Mr. Brace's declaration starts at 496 in the excerpt set record. And that's for something that took place two years before, right? Approximately. And it turned out he had some kind of shoulder and arm injury from that, right? That's correct, Your Honor. Is there anything there that says that he had a full physical examination and it said gait normal, knee fine? No, it didn't get as specific as that. His attorney could have brought in his doctor to testify that there was nothing wrong with his lower body. All the evidence that I've seen had to do with the upper body as a result. Right. But you say the lawyer could have brought in a doctor to say there's nothing wrong with his lower body. How do you know that? I mean, did you interview the doctor? No, I wasn't the attorney. This is a habeas appeal, and he represented himself. But you're representing him on habeas, and so your duty is to develop a record. Did you find out from the doctor, get any evidence that could really be strong evidence that he didn't have a limp? If I was representing him in a district court, I would have attempted to do that, but I was appointed. Only for appeal? Only for the appeal. Okay. But so is there anything in the record that shows that the doctor would have testified that he didn't have a limp, that he had normal gait? Not specifically, but there is a letter from a doctor that did take care of him for those years. That's Koga? Koga. Koga? ER-51. He doesn't specifically say that there's something wrong with his gait or with his lower body, but he outlines problems that Mr. Brown suffered. But that was from the 19 ñ yeah, I have it right here. It says 1995 accident. It talks about his upper shoulder, scapula, and upper back. But it doesn't say whether he had a preexisting limp or ñ No, no, it doesn't. See, I think if you have an accident and you go to the doctor and you go to an orthopedic, they would probably go through the whole thing, and there would be something, you know, check off. Do you have a problem with your limp? Do you have a problem with your leg? And they would indicate all these things in the medical records. Is there such a record? Not to my knowledge, and that's what his attorney should have done. I think that's the point of my argument. He should have investigated the ñ interviewed the doctors, interviewed the family members. But, see, what the attorney said and what all the courts have held is that it's hard for him to prove the negative. I'm concerned. If he really had very strong evidence that he didn't have a limp, maybe you have a point here, and not trying to get to what is the evidence. The problem is because he didn't have a lawyer in the habeas, not all the evidence has been developed. But at the time, what was ñ this is an IAC claim. So at the time, what evidence was available to the attorney at the time that would demonstrate that his decision not to counter the limp characteristic was not a strategic decision? I mean, what was available to him at the time? What did he have at the time? At the time, he had available to him, you know, the friends ñ to start off with the friends and family. And also he did ñ He said that he didn't ñ strategically. Now we're talking about whether or not this is deficient performance or a strategic decision. He testified that he thought the family and friends would not be credible. And in light of the fact that the prosecutor hadn't raised it in the affirmative case, he thought it would be better not to make it an issue. Yes, the family did mention that there were medical records. And in the hearing for a new trial, Mr. Dekler did mention he had heard that they were medical ñ that there were medical records available. But he chose not to review them. But if we were to send it back for an evidentiary hearing, what would you put on? If it were me, I would interview all ñ get all his medical records and interview his ñ all his doctors that took care of him. See, what you're saying is you'd look into it. You'd investigate it. How do you know it would come up with anything? Where right now, I think you have to show that if we send it back for an evidentiary hearing, you'd be able to put something on. You'd be able to make a credible showing of prejudice, assuming that this was prejudicial. See, I was recluded to investigate it on appeal because it wouldn't have made any difference as far as this case is concerned. But my point is this is a medical condition that's very obvious. It doesn't come and go. And if his attorney would testify that he reviewed all his medical records, did not see anything that affected ñ Well, actually, limps do come and go. Yeah, I have one that comes and goes. You'll probably see me ñ And actually, if we're talking about, you know, just general opinion, my opinion would be if we don't have a doctor that says limps don't come and go. Well, he said he had suffered from a basketball injury that created a limp. And if you have ñ assuming that if it does come and go, then you have all these different people that know him from all different walks of his life, the attorney, friends, and family, and they all say we've never seen him with a limp. Well, then I think the jury should have been able to heard that, and then they can make their own determination. What about Moore's wife? I mean, she lived across the street. Is there anything in the record as to whether she saw him walk with a limp? Whose wife? Moore, the victim. Moore was the victim, right? Correct. Right, the one who got shot. Oh, Ms. Turner, yes. Pardon me? Her name was Hattie Turner. Yeah, and that was Moore's wife, right? Correct, her girlfriend. There was nothing in the record that I can recall that she mentioned whether or not ñ How about any neighbors of Brown? Did anyone say he walked with a limp? No, nothing that was in the record except for his alibi witness, Mr. Randolph. Mr. Randolph testified he has never seen Mr. Brown walk with a limp. So basically what you have is you have a lawyer and a doctor who were involved in a 1995 motor vehicle accident case say that from the period ñ and I guess the doctor says from 1991 through 1996 he watched him and he had this injury in 1995 and he had upper shoulder, upper back problems and says nothing about limp or no limp. And then you have the personal injury lawyer say that I handled the upper back and shoulder injury. He didn't have a limp. That's really all you have. And that I've served him over the period of time I've represented him. I've never seen him walk with a limp. Family members have never seen him walk with a limp. And also his friends, one testified he said he'd never seen him walk with a limp. And also Mr. Deckler said he was aware of ñ Which friend testified? Mr. Randolph. But he testified at trial, right? He was one of the two. Right now as I stand here I can't recall if this was at the trial or it's a motion for a new trial hearing. No. And I think that the whole point of this is that the victim maintained for three months that he did not see the shooter's face. He told the police that the shooter wore a ski mask with holes for the eyes and was positive the only reason why he identified Mr. Moore as the shooter was because of this limp that he thought he had. But the jury knew that. I read the examination. And he cross-examined him by bringing out that at the date of the accident he said, I think it's Sam. He said he had the mask on. And then when he was in recovery he said he had the mask on. And then he even brought out that a couple of months later the officer told him that they weren't going on the case because of the mask. And then he ends up talking to the officer again and saying, well, I did see him actually before run with the gun. And then when I said, hey, Sam, it's you, he turned around and pulled the mask down. So, I mean, the jury knew how the story had evolved over time. And he didn't say he saw his face until the officer told him they weren't going on it. Well, actually, I just reread that part of the testimony yesterday. And he was very evasive, the victim. It didn't come out quite that way. The defense attorney would ask, well, do you see the actual flesh? And he would respond by saying, I saw him, I saw him. He would never really admit to it. But the officer brought out what the police officer's reports were, that he didn't admit it. Yes. And then I think where the – but it wasn't as strong as the victim's testimony. And I think what really hurt Mr. Brown was during the closing argument, the prosecutor really hammered that the victim never wavered from the fact that he saw, saw Mr. Brown from the very beginning as the shooter. Always – see, that's where the problem is. From the very beginning, from the very first night, he said that he did not see the shooter at all until he found out a warrant wasn't going to be issued. Then he said he changed his mind. Now I can see the shooter. And I think – You are well over your time. I'm sorry.  That's okay. Thank you. May it please the Court. My name is Tammy Warwick, and I represent the respondent appellee, Warden Hall. Counsel's decision not to present evidence about the physical identifying trait, the limp, was a tactical decision that is entitled to deference. Counsel pursued, as was mentioned earlier with the court, counsel pursued the victim's testimony about the differences in the descriptions that appeared to get stronger over time. The attorney also talked to – brought out the – I'm sorry, not the prosecutor, the defense attorney. The defense attorney also brought out the officer's testimonies about the – Let me ask you. I'm bothered about this limp because, frankly, if there was really strong evidence that the guy had no limp, unbiased, strong evidence, what happens in the first interview when he's laying there thinking that he might be dying, he said, I know it's Sam. Sam has a limp. He had a limp. And what if the guy had no limp? What if it was objectively a fact that he had no limp? Shouldn't a lawyer have brought that out? But there's nothing to indicate that the evidence that the attorney had – he talked to the family members. He thought that would be biased testimony. I think that's a reasonable conclusion to come to. And as the attorney said, that it would be a difficult thing to disprove. I mean, it was – that it was an old basketball injury. We don't know if it was permanent, if it was temporary. This was a neighbor who had seen Mr. Brown for the last – I think they had lived by each other four to five years, had seen him on a regular basis. So some of the neighbors should have seen him limp too. Hattie, whatever her name was, the wife or the girlfriend of Mr. Moore, should have seen him limp also. And the prosecutor didn't put that on. Did the defense attorney interview these people to see whether he actually had a limp? There's no indication that he talked to anyone other than the family members. And the fact that that trait – but, again, it was a tactical decision not to pursue a physical identifying trait that hadn't been highlighted at trial. But how can he make a tactical decision if he hasn't investigated it carefully? Well, and counsel – but with investigation, they have a duty to investigate. But if there's a tactical decision not to pursue a strategy, they don't have an investigation to talk to every possible witness that could have testified to that. And the fact of the matter is that it wasn't attributed, and counsel chose to pursue the fact that the victim's testimony got stronger over time and the fact that the officers could testify different accounts. And it's reasonable to not want to attribute a physical characteristic that was difficult to prove the negative. And if the jury believed it, then they would have thought that the victim could say, this is definitely the person because I know he has a limb. I'm curious. He went to trial on this. He was at trial, presumably. Couldn't the jury see if he was limping or not? I would imagine the jury would have. But, again, makes it difficult because was it temporary? Is it something that he had all the time? If it was temporary and he didn't have it, the jury could see that he wasn't limping. That is correct. That's if the jurors saw him come and go. But since he was in custody, they may not have. They may not have. We don't know. None of that's in the record. The other thing that concerns me is kind of the ad hoc way he kind of put on the defense at the end. Now, Mr. Brown did tell the judge that he decided not to testify, and then he changed his mind. But what about his alibi witnesses? First he said he couldn't find them. He gave the names to the investigator. But then all of a sudden, once Mr. Brown testifies, those two witnesses materialize. Well, I think it is interesting, the sequence of events. But at the same time, the claim is that it would have been easy to locate these witnesses. Initially the investigator looked at directories and talked to Mr. Brown's mother and couldn't locate these witnesses. The next time the investigator talked to Mr. Brown's mother, she was able to give a person who identified these people. And the declarations that are part of Petitioner's excerpts, it shows there were a lot of numbers that were disconnected. And also the fact that it was an unconvincing alibi defense. And I think here we can look at counsel's decision, again, was reasonable not to want to pursue this alibi defense. And it was also very reasonable that counsel did not want the petitioner to testify, given the fact he opened the door on cross-examination for some damaging evidence against him. But if he didn't testify, he had nothing. I mean, it was an open-and-shut case. But the problem with the alibi defense, and arguably that could have sealed the jury's decision that it certainly wasn't credible. And the trial court made a finding at the new trial motion that these witnesses didn't appear credible. There were problems with their demeanor, the way they answered questions. The biggest problem was the letter. And the exchange of letters that Mr. Jones had written a letter to Mr. Brown saying he didn't recall any of the events. And then when Mr. Brown writes a letter back telling him his alibi defense, that was the testimony that Mr. Jones presented at trial that mirrored the letter. And certainly the jury could come to a conclusion that that wasn't a credible defense. Unless there are any further questions, respondent will submit. All right. Thank you. I'll give you an extra minute. Mr. Brown decided not to testify because he expected his attorney to bring on his alibi witnesses. He had talked to his attorney, and he was assured the witnesses were to show up. So when he made that decision not to testify, he was waiting for then for his attorney to put on his case. As soon as he made that decision not to testify, that's when he heard his attorney tell the judge, there will be no more witnesses, we rest. And that's he was expecting his defense. Regarding the letter exchange, this occurred on March 30, 1997. Mr. Brown was arrested in July or after July 1998. It wasn't until a year later when these witnesses found out that they were alibi witnesses. And a jury can reasonably understand that those letters were helping them to prompt their memory. It was a year later. There's no way anyone can remember what they did with their friends a year ago. And that's another way of looking at those letters. Had Mr. Deckler interviewed Mr. Jones and discussed the context of those letters, it could have been better. But one of the things was that one of them remembered that Brown got a call in the morning that his neighbor had been shot. Exactly. That's what tied the whole thing together. Right. So how could they forget that? Because Mr. Brown was not arrested until several months later. They did not know. This happened in March. They didn't realize that he was arrested. Yeah, but if someone was at your house and all of a sudden they got a call that their next-door neighbor had been shot and, you know, might die, wouldn't you remember that? Yes. Even a year later? Yes, that's how to remember that Mr. Brown was with him that evening. That's what brought it all together. They couldn't remember the exact date. That was March 25th. Well, they first said that they really didn't remember much about it at all until Mr. Brown wrote them the letter. Right. Then it came back to them. And a jury can reasonably, if they heard ñ if Jones was prepared and could have testified up front, yes, this is what happened, we had this exchange of letters, and this is how it came back to me, a jury could have concluded that they had ñ that the letters were, A, to remind them what happened a year ago. But getting back to the limp, and I hate to keep focusing on that, all you have is the one brief letter from 2002 from the doctor and from the lawyer. Nothing other than the lawyer says he didn't notice a limp. You have no medical evidence that says that he was examined and he didn't have a limp. No medical evidence. This is testimony from friends and family. All right. Thank you, counsel. Brown v. ñ oh, I'm sorry. Gallen v. Harris will be ñ no, I'm sorry. Brown v. Hall will be submitted.
judges: Thompson, Wardlaw, Moskowitz